FILED

April 14 2010

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 09-0358

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 79

ASPEN TRAILS RANCH, LLC,

        Appellant,

   v.

BARRY J. SIMMONS and PETE ELLIOT,
and HELENA CITY COMMISSION,

        Appellees.


APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDV 2005-883
Honorable Jeffrey M. Sherlock, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

          Colleen M. Dowdall, Jane E. Cowley, Worden Thane P.C.,
          Missoula, Montana

      For Appellees:

          Jack R. Tuholske, Tuholske Law Office, P.C., Missoula, Montana


                Submitted on Briefs:  February 10, 2010

                        Decided:  April 14, 2010


Filed:

             _____
                      Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Aspen Trails, LLC (Aspen Trails), appeals from a decision of the First Judicial District Court, Lewis and Clark County, voiding a preliminary subdivision plat which had been approved by the Helena City Commission (Commission). For the reasons set forth below, we affirm the District Court.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In August 2005, a developer named Richard Bowen (Bowen) filed an application for the Aspen Trails subdivision before the Commission. The proposed subdivision was to be located north of the city limits of Helena, Montana, and would contain approximately 325 residential lots over 260 acres. The proposed subdivision was to be adjacent to the Prickly Pear Creek, which flows through the Helena Valley into Lake Helena and then on to the Missouri River. Aspen Trails proposed that the subdivision be annexed to the city of Helena and be connected to Helena's water and sewer systems.

¶3 In conjunction with the application, Aspen Trails submitted an environmental assessment (EA) of the proposed subdivision prepared by Morrison-Maierle, Inc. The main body of the EA is 53 pages in length and contains several appendices. The EA includes legal and environmental descriptions of the proposed development, a community impact assessment (covering issues such as water supply, sewage disposal, roads, drainage, and land use), a summary of probable impacts and proposed mitigation measures, and other issues concerning the proposed development.

¶4 Additionally, a report (Staff Report) on the proposed subdivision was prepared by the City of Helena Planning Division. The Staff Report made findings of fact regarding

2

the subdivision's impact on areas such as agriculture, local services, the natural environment, wildlife and wildlife habitat, and public health and safety. The Staff Report proposed 27 conditions in order to mitigate the potential for adverse impacts indentified in its findings and recommended the approval of the preliminary plat subject to these conditions.

¶5 On October 18, 2005, The Helena/Lewis and Clark County Consolidated Planning Board (Planning Board) took public comment on the proposed development. The Planning Board reviewed the EA and the Staff Report. On October 25, 2005, the Planning Board voted to deny the application. The Planning Board determined that some of the impacts from the development, such as those on agriculture, local services, and public health and safety, could be mitigated. However, the Planning Board further concluded that the development's impacts on the natural environment, wildlife, and wildlife habitat could not be mitigated and denied the application on this basis.

¶6 On November 21, 2005, the Commission held a public meeting to discuss the proposed development and application of the preliminary plat. At that meeting proponents and opponents gave public testimony. Appellee Pete Elliot (Elliot) spoke in opposition to approval of the preliminary plat. Elliot is a resident of the Helena Valley whose property is contiguous to the proposed subdivision. Some members of the Commission expressed concern about the proposed subdivision with respect to flooding and high groundwater in the area, but nonetheless voted to approve the preliminary plat. The Commission issued findings of fact and attached 27 conditions to the approval of the

3

subdivision preliminary plat. The Commission determined that any detrimental impacts resulting from the subdivision could be mitigated with appropriate measures.

¶7 On December 16, 2005, Elliot, and two additional plaintiffs named Donald Zelenka and Barry J. Simmons[1] (collectively Landowners) filed suit against the Commission in District Court, challenging its decision to approve the preliminary plat. A first amended complaint was filed on February 24, 2006. On April 17, 2006, the Commission moved to dismiss the complaint for the Landowners' lack of standing and failure to state a claim for which relief could be granted.

¶8 On October 3, 2006, the District Court denied the motion to dismiss and held that the Landowners did have standing to sue the Commission. The District Court noted that Elliot was a contiguous landowner with respect to the proposed subdivision and was permitted to appeal the decision of the Commission pursuant to § 76-3-625(3), MCA, of the Montana Subdivision and Platting Act (MSPA). Additionally, the first amended complaint alleged that the proposed subdivision would add significantly to traffic and congestion on existing roads and that the installation of pipelines and lift stations may have a significant adverse impact on existing neighborhoods. Furthermore, the complaint alleged that the proposed subdivision would have substantial and significant impacts to ground and surface water, as well as wildlife habitat. The District Court also took note of the fact that the first amended complaint would irrevocably change the rural character of the area. The District Court also took note of the fact that the first amended complaint

---

[1] Simmons is a resident of the Helena Valley whose property is near the proposed subdivision.

4

alleged specific violations of the MSPA, the Helena Growth Policy, and Article IX, Section 1 and Article II, Section 3 of the Montana Constitution.

¶9 At the conclusion of its order, the District Court observed that the first amended complaint had seemingly failed to tie the injury complained of to any specific action taken by the Commission. In this connection, Elliot had filed a supplemental affidavit before the court, in which he specifically alleged that the proposed subdivision would, among other things, adversely affect the enjoyment of his property, change the stream channel of Prickly Pear Creek, potentially disturb the natural recharge of the aquifer, adversely impact the quality of his water supply, and also have a long-term negative effect on the value of this property. The District Court determined that the first amended complaint, when coupled with the averments in the supplemental affidavit, sufficiently tied together the action of the Commission with a complaint of harm. Thus, the District Court authorized the plaintiffs to file a second amended complaint incorporating the specific allegations of harm as set forth in the supplemental affidavit.

¶10 Simmons and Elliot filed a second amended complaint on October 20, 2006. Ronald Zelenka was dropped from the suit. In this complaint, Landowners alleged that neither the EA nor the Staff Report adequately addressed resulting impacts from the proposed subdivision. Landowners claimed that the EA did not address resulting impacts to water quality of the Prickly Pear Creek and Lake Helena watershed from the proposed subdivision. The Landowners also claimed that the Staff Report did not adequately address the environmental and community impacts arising from the subdivision on water quality issues vis-à-vis the installation of collection systems and a proposed lift station.

5

The Landowners argued that the Commission's findings of fact for conditional approval did not adequately describe the potential negative impacts from the development, and that the attached conditions did not adequately mitigate the resulting negative environmental impacts, especially with regard to impacts on wildlife, water quality, and flooding.

¶11 The District Court held a one-day evidentiary hearing in this matter on December 22, 2008. The Landowners and the Commission presented testimony and evidence. The Landowners claimed the preliminary plat should be voided based on the inadequacy of the EA. Landowners argued that under the MSPA, the EA provided the only mechanism for the public and the governing body to properly review the effects of a subdivision before a preliminary plat is issued. Landowners contended the EA was inadequate in several key respects. First, they observed that the subdivision was to be located in an area of very shallow groundwater, adjacent to Prickly Pear Creek. The EA itself stated that the project area has a high groundwater table, only 2 to 10 feet below the surface. Landowners contended that the EA did not provide further information on groundwater levels beyond this statement and did not provide adequate baseline information taken from monitoring wells throughout the proposed subdivision in order to quantify the actual groundwater depths, rates, directions of flow, and seasonal fluctuations in the water table. Landowners' expert, Chris Cerquone (Cerquone), testified that without this type of baseline information the impacts to the groundwater could not be adequately evaluated given the high water table and the size of the proposed development. Accordingly, Landowners claimed the EA did not provide "available groundwater information" as required under § 76-3-603(1)(a), MCA, and thus did not comply with the MSPA.

¶12 Additionally, Landowners asserted that the EA did not address impacts of surface pollutants on the groundwater or Prickly Pear Creek itself. Landowners argued that the EA did not account for impacts due to "nonpoint" sources of pollution, such as fertilizers, pesticides, herbicides, and other household materials which would affect the groundwater with the addition of the subdivision. Although the connection of the subdivision to city of Helena sewer systems arguably had a lesser impact than the use of septic systems, Landowners contended that the placement of sewer lines in either water or soil would affect their leakage potential and should have been evaluated. Landowners argued the EA failed to address these impacts, as required under §§ 76-3-603 and -608, MCA, and that failure to do so rendered the EA inadequate in this regard as well.

¶13 Third, Landowners contended that the EA lacked adequate, site-specific information about base flood elevation in the area, and did not contain a hydraulic analysis to evaluate how the addition of new roads, new structures, the re-routing of irrigation ditches, and filling wetlands, could affect the flooding potential of the area. Finally, Landowners claimed that the EA was inadequate because it failed to address the problem posed by "soil liquefaction"[2] in the area of the proposed subdivision.

¶14 The Commission disputed these contentions, arguing that the EA adequately addressed the impacts complained of by the plaintiffs, and that the conditions attached to the approval of the subdivision properly mitigated any adverse effects from the subdivision. For instance, regarding storm water runoff, the Commission's conditional

---

[2] Soil liquefaction occurs when water-saturated granular material is transformed from a solid state to a liquid state through motion, most often times earthquakes.

approval required that infrastructure plans had to be submitted and reviewed prior to approval. To address the issue of high groundwater, the subdivision had covenants which restricted homes from having basements in high groundwater areas. With respect to flooding, the findings in the conditional approval identified the 100 and 500-year floodplains, and the subdivision plat itself did not place any lots within the 100-year floodplain. The Commission further claimed that city building codes would mitigate the impacts of locating homes within the 500-year floodplain. Finally, with respect to impacts on wetlands, the Commission noted that the conditional approval required the replacement of eliminated wetlands at a ratio of one-for-one.

¶15 On March 18, 2009, the District Court entered its findings of fact, conclusions of law and order voiding the preliminary plat for Aspen Trails' subdivision. Citing to *Keily Const., L.L.C. v. City of Red Lodge*, 2002 MT 241, 312 Mont. 52, 57 P.3d 836, the District Court noted that it would review the Commission's decision under the "arbitrary and capricious or unlawful" standard of review. *Keily*, ¶ 69. The District Court noted that the MSPA required the Commission to consider the subdivision application, the preliminary plat, the EA, public hearing, and **planning board recommendations. Section 76-3-608(1), MCA. Section 76-3-603(1), MCA, requires the EA to contain information including:

> (a) a description of every body or stream of surface water that may be affected by the proposed subdivision, together with available ground water information, and a description of the topography, vegetation, and wildlife use within the area of the proposed subdivision;
> (b) a summary of the probable impacts of the proposed subdivision based on the criteria described in 76-3-608 . . . .

The District Court, citing to § 76-3-608(3)(a), MCA, also stated that one of the primary criteria to be reviewed was the impact of the subdivision on the natural environment.

¶16 Before turning to an analysis of the adequacy of the EA, the District Court considered the appropriate standard under which to evaluate the EA. The District Court adopted the Landowners' recommendation that the Commission's review of the EA be evaluated under the "hard look" standard as discussed in *Clark Fork Coalition v. Mont. Dept. of Env. Qual.*, 2008 MT 407, 347 Mont. 197, 197 P.3d 482.

> An agency must take a "hard look" at the environmental impacts of a given project or proposal. Implicit in the requirement that an agency take a hard look at the environmental consequences of its actions is the obligation to make an adequate compilation of relevant information, to analyze it reasonably, and to consider all pertinent data. Admittedly, court review of an agency decision, including an environmental decision, is limited. Still, while a court is not to substitute its judgment for that of the agency, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. In other words, the Court looks closely at whether the agency has taken a hard look at the question presented. The Court does not take a hard look itself but requires that the agency does so. The Court focuses on the validity and appropriateness of the administrative decision making process without intense scrutiny of the decision itself. In this way, the Court examines the elements of the decision without interfering with the administrative authority over the decision itself.

*Clark Fork Coalition*, ¶ 47 (citations omitted).

¶17 The District Court then considered whether the Commission took a "hard look" at the EA submitted in conjunction with the preliminary plat. Turning to the adequacy of baseline information regarding groundwater, the District Court noted that § 76-3-603(1)(a), MCA, requires "available groundwater information" be provided. The EA only mentioned that the depth of groundwater was 2 to 10 feet below the surface, but

did not reference other available information such as a U.S.G.S. report on the groundwater covering the project site. Furthermore, the District Court noted that there had been other information about groundwater generated from test wells which had not been presented or discussed in the EA. The District Court also observed that Landowners' expert Cerquone opined that the high groundwater in this area needed to be studied in detail and that water depths should be monitored to ensure accurate information in order to assess the impacts from the subdivision.

¶18 The District Court determined that the paucity of information in the EA regarding groundwater information prevented the Commission from taking a "hard look" at impacts on water quality. The District Court noted that water quality impacts were referenced in the EA and that the restrictive covenants prohibited the construction of basements in areas of high groundwater in order to mitigate this impact. Beyond that, no further information on groundwater depth was provided. The District Court reasoned that without knowing the specific depth of groundwater, it was plausible that sewer pipes could be placed directly in groundwater, increasing the leakage potential and possible contamination of Prickly Pear Creek. The EA, however, did not even address this issue or present the Commission the opportunity to consider this impact.

¶19 The District Court also observed that the EA did not discuss the impacts of surface pollutants on the groundwater or Prickly Pear Creek. The District Court agreed with the Landowners' contentions that potential impacts from the use of fertilizers, pesticides, herbicides, and other deleterious products created by the addition of 325 homes in the subdivision, should have been discussed. The District Court noted Cerquone's testimony

that storm water retention ponds would not resolve this issue because the pollutants would not bind to solid particles and settle out in the pond. The Commission's expert Mark Brook (Brook), a professional engineer and hydrologist with Morrison-Maierle, Inc., disagreed with Cerquone's assertion that these materials would be driven into the groundwater. The District Court simply noted that given the high groundwater in this area, impacts from these pollution sources should have been discussed in the EA.

¶20 Regarding the Landowners' contentions that the EA lacked the requisite information on base flood evaluations, the District Court noted that the EA did contain a flood plain map derived from FEMA maps. While the Landowners had misgivings about the reliability of FEMA-derived maps in this context, the District Court noted that the Legislature had specifically provided that such maps create a rebuttable presumption of reasonable hydrological certainty under § 76-5-202(3), MCA. Thus, the District Court held the EA did contain adequate information about the base flood evaluations for the proposed subdivision.

¶21 The District Court then considered whether the EA was required to have a hydraulic analysis or other evaluation of flood impact from the infrastructure improvements required for the subdivision. The District Court noted that the EA did deal with the issue of flood hazard evaluations, and discussed the FEMA maps and the fact that none of the proposed lots would be located within the 100-year floodplain. The EA also noted that a reconstruction of one of the roads near the subdivision might affect the flood potential of the area and recommended a hydraulic analysis of the proposed redesign of the road. The District Court concluded the EA was adequate in this regard. It

11

noted that reliance on the FEMA floodplain map was appropriate. The District Court further noted that the EA did address surface runoff with the installation of storm water retention ponds, and that the retention ponds were not to discharge at rates greater than the existing discharge from the site during a 100-year flood event. Accordingly, the District Court rejected Landowners' contentions that a more detailed hydraulic analysis, flood evaluation, or storm water plan was required to make the EA adequate in this regard.

¶22 Finally, the District Court turned to the adequacy of the EA on the issue of "soil liquefaction." The District Court noted that the issue was discussed in the EA and the EA suggested a geotechnical evaluation be undertaken to address this issue in order to generate recommended mitigation measures. The Commission made the geotechnical report, and the incorporation of its recommendations into all roads and engineered structures, a condition of approval. This condition would also require an evaluation of the soil liquefaction issue on home construction. The District Court found the EA was sufficient on this issue. It noted that the EA alerted the Commission to the soil liquefaction issues and addressed this impact by requiring the adoption of measures from the geotechnical report.

¶23 In sum, the District Court concluded the EA was adequate as to a base flood elevation survey, the requirement of a hydraulic analysis, and the soil liquefaction issue. The EA was inadequate, however, regarding issues related to probable impacts arising from surface pollution entering the groundwater and/or Prickly Pear Creek, and did not contain available groundwater information. For these reasons, the District Court

12

concluded that the approval of the preliminary plat was unlawful for failure to provide available groundwater information, and arbitrary and capricious insofar as it failed to consider surface pollution impacts resulting from the subdivision.

¶24 The Commission declined to challenge the District Court's decision. Aspen Trails, which had not previously been a named party in the proceedings, subsequently sought leave to intervene and to alter or amend the judgment. The Landowners opposed Aspen Trails' intervention, arguing it was untimely. The District Court granted Aspen Trails leave to intervene, but denied the motion to alter or amend. The District Court analyzed the motion to intervene under *Connell v. State Dept. of Soc. & Rehab. Servs.*, 2003 MT 361, 319 Mont. 69, 81 P.3d 1279. The District Court agreed with Landowners' contentions that it would be inequitable to allow Aspen Trails to intervene in order to simply reopen issues which had already been litigated. However, it also concluded it would be inequitable to foreclose Aspen Trails the right to appeal the District Court's decision after the Commission declined the opportunity to do so. The District Court concluded that Aspen Trails' motion to intervene was timely made after the Commission decided not to appeal, and that its interests in the appeal were sufficiently substantial so that it should have the opportunity to be adequately represented.

¶25 Aspen Trails now appeals from the decision of the District Court. The Landowners cross-appeal from the District Court's decision to allow Aspen Trails to intervene in this matter. We state the issues on appeal as follows:

¶26 **Issue One:** *Did the District Court abuse its discretion in allowing Aspen Trails to intervene after trial?*

13

¶27    **Issue Two:** *Did the District Court err in concluding that the Landowners had standing in this case?*

¶28    **Issue Three:** *Did the District Court commit reversible error when it voided the preliminary plat?*

## STANDARD OF REVIEW

¶29    A district court's ruling on a motion to intervene is reviewed for an abuse of discretion. *Grenfell v. Duffy*, 198 Mont. 90, 95, 643 P.2d 1184, 1187 (1982). A district court abuses its discretion when it acts arbitrarily, without the employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *Lee v. USAA Cas. Ins. Co.*, 2001 MT 59, ¶ 27, 304 Mont. 356, 22 P.3d 631.

¶30    A district court's determination regarding standing presents a question of law which we review for correctness. *In re Charles M. Bair Family Trust*, 2008 MT 144, ¶ 86, 343 Mont. 138, 183 P.3d 61.

¶31    We review a district court's decision pursuant to § 76-3-625(2), MCA, of the MSPA to determine whether the record establishes that the governing body acted arbitrarily, capriciously, or unlawfully. *Kiely Const.*, ¶ 69. As we recently explained in *Citizens for Responsible Development v. Bd. of Co. Commsrs. of Sanders Co.*, 2009 MT 182, 351 Mont. 40, 208 P.3d 876, this standard of review breaks down into two basic parts. One component concerns whether the agency action could be held to be unlawful. *Citizens*, ¶ 8 (citing *North Fork Preservation Assn. v. Dept. of State Lands*, 238 Mont. 451, 459, 778 P.2d 862, 867 (1989)). An agency action is unlawful when it fails to comply with the requirements of applicable statutes. *Citizens*, ¶ 26. The second part of

14

the inquiry concerns whether the agency decision was arbitrary and capricious. *Citizens*, ¶ 8. A reversal under this standard of review "is not permitted 'merely because the record contains inconsistent evidence or evidence which might support a different result. Rather, the decision being challenged must appear to be random, unreasonable, or seemingly unmotivated, based on the existing record.' " *Kiely Const.*, ¶ 69 (quoting *Silva v. City of Columbia Falls*, 258 Mont. 329, 335, 852 P.2d 671, 675 (1993)).

## DISCUSSION

¶32 **Issue One:** *Did the District Court abuse its discretion in allowing Aspen Trails to intervene after trial?*

¶33 In their cross-appeal, Landowners contend the District Court abused its discretion in allowing Aspen Trails to intervene after final judgment was entered. Landowners note that M. R. Civ. P. 24(a) requires that a motion to intervene be timely. *See Connell*, ¶ 20. Landowners argue Aspen Trails' motion to intervene failed to meet this standard. Landowners contend that Aspen Trails was aware of this litigation since early on in the proceedings, and did not seek to intervene until June 2009, roughly two months after final judgment was entered. Landowners argue that post-judgment intervention should be allowed only in exceptional cases, and urges this Court to rely upon federal caselaw in assessing whether Aspen Trails' motion was timely. In this connection, Landowners contend that Aspen Trails both knew about the pending litigation and was invited to intervene by the Landowners, but refused to do so and claimed the dispute was only between the Landowners and the Commission. Landowners further claim that Aspen Trails specifically knew the substance of the EA would be a central issue as early as

15

January 2008. Since Aspen Trails had knowledge of the underlying issues, and waited until post-trial proceedings to intervene, plaintiffs contend leave to intervene should have been denied. Citing *Connell*, *Grenfell*, and *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297 (9th Cir. 1997), they posit that such post-trial interventions are disfavored and routinely denied. Finally, Landowners argue the District Court failed to adequately consider the resulting prejudice to them if leave to intervene was granted. Specifically, Landowners note they have been required to expend more time and resources to defend the judgment on appeal.

¶34 Aspen Trails asserts the District Court did not abuse its discretion in this instance. Aspen Trails notes that the determination of timeliness is a discretionary function of the District Court, and that the District Court acted within its discretion when it determined intervention was timely. Aspen Trails asserts its intervention did not create any delay because it was well within the time allowed for an appeal from the District Court. It also argues its delay in intervening was reasonable because it only decided to intervene after the Commission signaled that it would not pursue an appeal, and only did so in order to protect its interests. Aspen Trails also argues that Landowners are not prejudiced, because it is simply taking up an appeal which the Commission could have taken had it chosen to do so. Additionally, Aspen Trails asserts that it has a right to intervene since its interests in this matter are substantial and no longer adequately represented.

¶35 We conclude that the District Court did not abuse its discretion when it allowed Aspen Trails to intervene after judgment was entered. We agree with Aspen Trails that its intervention has not caused any delay in this matter, and that its interests are

16

substantial and no longer adequately represented since the Commission has declined to appeal. We also agree that the Landowners cannot claim prejudice simply because they are now required to defend the District Court's decision on appeal. While it may be inconvenient for the Landowners to have to defend their successful judgment on appeal, we cannot say it has caused them prejudice to defend against Aspen Trails, as opposed to the Commission. The District Court has the discretion to weigh all of these factors when considering whether to grant or deny leave to intervene. Here, we cannot say that the decision to grant leave was arbitrary, without the employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice. *Lee*, ¶ 27. Thus, we affirm the District Court on this issue.

¶36 **Issue Two:** *Did the District Court err in concluding that the Landowners had standing in this case?*

¶37 Aspen Trails argues that neither Simmons nor Elliot had standing to pursue their claims in District Court. "To establish standing to bring suit, the complaining party must (1) clearly allege past, present, or threatened injury to a property right or a civil right, and (2) allege an injury that is distinguishable from the injury to the public generally, though the injury need not be exclusive to the complaining party." *Fleenor v. Darby Sch. Dist.*, 2006 MT 31, ¶ 9, 331 Mont. 124, 128 P.3d 1048. Standing is a "threshold jurisdictional question" especially in those cases where a statutory or constitutional violation is alleged to have occurred. *Fleenor*, ¶ 7.

¶38 The MSPA provides a statutory basis for standing. Under § 76-3-625(2), MCA, a party aggrieved by a decision of a governing body to approve, conditionally approve, or

17

deny a preliminary plat for a subdivision may appeal the decision to the district court. An "aggrieved person" is one "who can demonstrate a specific personal and legal interest, as distinguished from a general interest, who has been or is likely to be specially and injuriously affected by the decision." Section 76-3-625(4), MCA. An aggrieved party who may challenge an agency decision includes "a landowner with a property boundary contiguous to the proposed subdivision or a private landowner with property within the county or municipality where the subdivision is proposed if that landowner can show a likelihood of material injury to the landowner's property or its value . . . ." Section 76-3-625(3)(b), MCA. Aspen Trails contends that neither Elliot nor Simmons have met the standing requirements under the MSPA.

¶39 Aspen Trails concedes that Elliot is a contiguous landowner, but argues that he lacks standing because he has not established that he is an "aggrieved person." Aspen Trails contends that Elliot has alleged only generalized concerns about the proposed subdivision which are insufficient to confer standing. Elliot's generalized concerns relate to impacts on the water table, wetlands, wildlife habitat, increased pollution to Prickly Pear Creek, and possible increased flooding. Aspen Trails contends that Simmons' concerns are even more generalized, and limited to unquantified concerns about a decrease in the value of this property due to placing tract housing in an area of the Helena Valley which is now rural.

¶40 The District Court, relying on *Clinton v. City of New York*, 524 U.S. 417, 118 S. Ct. 2091 (1998), concluded that so long as one of the Landowners established standing, the jurisdictional requirement of standing was satisfied for both Landowners.

18

Aspen Trails disputes this conclusion, arguing that both Landowners must establish standing on their own, and cannot rely on the standing established by the other.

¶41 We conclude the District Court did not err in concluding that Elliot had standing to challenge the Commission's decision to approve the preliminary plat. It is undisputed that Elliot is a contiguous landowner with respect to the proposed subdivision. Elliot averred that the subdivision would affect the enjoyment of his property given that the area of the subdivision was prone to flooding, and had the potential to change the stream channel of the Prickly Pear Creek. Further, Elliot alleged that the dense development and accompanying storm water run-off would potentially disturb natural recharge to the aquifer taking place on agricultural land, and could adversely impact the quality of his water supply. Elliot also alleged impacts to wildlife habitat and wetlands, increased noise, traffic, and light pollution, and result in a decrease in the value of this property.

¶42 The allegations by Elliot were sufficient to confer standing upon him to challenge the Commission's decision. Elliot has alleged a specific injury to both his property rights and rights as a citizen of this state. In *Mont. Envtl. Information Centr. v. Dept. of Envtl. Qual.*, 1999 MT 248, 296 Mont. 207, 988 P.2d 1236 (*MEIC*), for instance, a group of plaintiffs sought to challenge the constitutionality of a statute which allowed certain discharges of water from watering or monitoring well tests, contending that the discharge was degrading the water quality in the Blackfoot River. The standing of the plaintiffs was challenged. We held that allegations of arguably adverse impacts to the headwaters of the Blackfoot River were sufficient to confer standing upon plaintiffs who fished, recreated, and relied upon the Blackfoot River as a source of potable water. *MEIC*, ¶ 45.

19

We noted that whether the plaintiffs had demonstrated sufficient harm to ultimately prevail on their claims was a "separate issue." *MEIC*, ¶ 45. Elliot's allegations of harm are similar to those of the plaintiffs in *MEIC*. Whether Elliot could actually prevail on his claims is a separate issue from whether he had standing to pursue them.

¶43 Furthermore, given Elliot's proximity to the subdivision and his specific averments, we conclude that his alleged injury is sufficiently distinguished from that of the general public, and sufficient to confer standing. Elliot has shown that the impacts from the subdivision have a more particular effect on him as a contiguous landowner than on the public at large. *See MEIC*, ¶ 44 (discussing *Missoula City-Co. Air Pollution Control Bd. v. Bd. of Envtl. Review*, 282 Mont. 255, 937 P.2d 463 (1997)). The fact that these impacts could also affect other individuals does not defeat standing for Elliot because the injury complained of need not be "exclusive to the litigant." *MEIC*, ¶ 43.

¶44 We further note that in denying the Commission's motion to dismiss, the District Court stated that "[d]uring oral argument . . . the parties agreed that if one party has standing, other parties may remain in the litigation without an inquiry into their standing." Because the Commission conceded this contention before the District Court, we will not allow Aspen Trails to challenge this holding on appeal, given the fact that it did not intervene in this matter until after judgment was entered.

¶45 As a practical matter, moreover, the District Court, Landowners, and the Commission were correct in agreeing that if standing was established for one of the Landowners the suit could go forward, because the Landowners both sought to void the preliminary plat. In *Clinton*, the City of New York, health care providers, unions, and a

20

farmer's cooperative in Idaho challenged the constitutionality of an act of Congress giving the President of the United States "line item" veto power. *Clinton*, 524 U.S. at 425, 118 S. Ct. at 2097. The cases were consolidated before the United States Supreme Court. The United States Supreme Court concluded that because the City of New York and the Idaho farmers' co-op had standing, the standing of the other parties did not merit further inquiry. *See Clinton*, 524 U.S. at 431 n. 19, 118 S. Ct. at 2100 n. 19. Here, likewise, the standing of any one of the Landowners would permit the suit to go forward. Thus, the District Court did not err in denying Aspen Trails' motion to dismiss and concluding that the Landowners had standing to challenge the decision of the Commission.

¶46 **Issue Three:** *Did the District Court commit reversible error when it voided the preliminary plat?*

¶47 Finally, Aspen Trails challenges the District Court's decision to void the preliminary plat. First, it argues that the District Court impermissibly considered the testimony of Cerquone and substituted its judgment for that of the Commission by concluding that the Commission failed to consider the high groundwater in the area of the subdivision and whether storm water run-off could pollute the Prickly Pear Creek. Aspen Trails argues the Commission did consider these impacts on groundwater and mitigated this impact by restricting the construction of houses with basements. Aspen Trails asserts that surface pollution impacts were addressed and mitigated with the requirement of a city-approved storm water drainage plan.

21

¶48 Aspen Trails further argues the District Court had no basis to determine that the EA was inadequate and that the actions of the Commission were unlawful, arbitrary, and capricious. Aspen Trails, relying on *Citizens*, suggests a less stringent standard of review for an EA prepared under the MSPA than the standard utilized by the District Court. It argues that an EA simply needs to provide information sufficient to allow a review of the proposed subdivision pursuant to the MSPA and that the amount of information required will vary from case to case. *See Citizens*, ¶ 19. Here, Aspen Trails argues the EA satisfied this standard because it identified possible impacts from the subdivision and proposed adequate mitigation of those impacts. Aspen Trail contends that adequate information about pollution from storm water drainage and impacts to the Prickly Pear Creek and groundwater was presented in the EA, and that the District Court erred in determining the EA was inadequate.

¶49 Aspen Trails further argues the District Court erred when it voided the preliminary plat. Aspen Trails contends it should be given an opportunity to present additional information to the Commission if required, and offer measures to mitigate the impacts instead of having the preliminary plat voided outright. For these reasons, Aspen Trails argues the District Court's decision should be reversed.

¶50 Landowners argue the District Court did not commit reversible error by voiding the Commission's approval of the preliminary plat. First, Landowners contend that under *Skyline Sportsmen's Assn. v. Bd. of Land Commsrs.*, 286 Mont. 108, 951 P.2d 29 (1997), the District Court properly considered the testimony of Cerquone at the evidentiary hearing in order to evaluate the adequacy of the EA. The Landowners further argue the

District Court properly concluded that the EA did not comply with the requirements of the MSPA, in that it failed to adequately describe the groundwater resources and failed to provide required information about the probable impacts of the subdivision on groundwater and surface water pollution. Landowners argue that no data about groundwater depth was provided, even though the Commission was aware of extremely shallow groundwater in the project area. Landowners also point out that the EA did not include groundwater information from an available U.S.G.S. report even though § 76-3-603(1)(a), MCA, requires that all available information on groundwater be included. Landowners further argue that the EA is inadequate because it does not contain any information about nonpoint source water pollution impacts on the Prickly Pear Creek, Lake Helena, or the shallow aquifer beneath the project site. In this connection, Landowners argue that the restrictive covenants fail to include mandatory measures that protect water quality.

¶51    The Landowners further contend that the District Court did not err in considering whether the Commission took a "hard look" at the EA. Landowners assert this standard was recently applied in *Clark Fork Coalition*, and that the District Court appropriately relied upon it by determining that the Commission was required to take a "hard look" at groundwater and pollution impacts resulting from the creation of over 300 new homes in areas of shallow groundwater adjacent to the Prickly Pear Creek.

¶52    Finally, Landowners contend that the remedy provided by the District Court, the voiding of the preliminary plat, was proper in this case under *Citizens*. Landowners argue that the MSPA does not confer a "right" on Aspen Trails to go back to the

23

Commission and propose new mitigation measures. While Aspen Trails certainly has the right to submit an application for another preliminary plat before the Commission, the District Court's decision to void the preliminary plat was not in error.

¶53 As an initial matter, we conclude that the District Court did not err when it conducted an evidentiary hearing and received additional evidence concerning the adequacy of the EA. As we stated in *Skyline Sportsmen's Assn.*,

> The standard of review of an informal administrative decision is whether the decision was arbitrary, capricious, or unlawful. *North Fork Pres. v. Dept. of State Lands* (1989), 238 Mont. 451, 458-59, 778 P.2d 862, 867. It was appropriate for the District Court, in applying that standard, to accept new evidence and not to limit its review to the administrative record. In a proceeding to determine whether an agency decision was arbitrary, capricious, or unlawful, unless the reviewing court looks beyond the record to determine what matters the agency should have considered, it is impossible for the court to determine whether the agency took into consideration all relevant factors in reaching its decision. *Asarco, Inc. v. U.S.E.P.A.* (9th Cir. 1980), 616 F.2d 1153, 1160.

*Skyline Sportsmen's Assn.*, 266 Mont. at 113, 951 P.2d at 32.

¶54 Second, we find no error in the District Court's conclusion that the Commission had to apply the "hard look" standard to the EA in this case. In *Clark Fork Coalition*, this Court considered a district court's review of an agency decision of the Montana Department of Environmental Quality (DEQ), authorizing a mining company to discharge water into the Clark Fork River. *Clark Fork Coalition*, ¶ 1. The Court said the *agency* must take a hard look at the environmental impacts of a given project. *Clark Fork Coalition*, ¶ 47. The district court's review of the DEQ's decision was whether it was arbitrary and capricious, or unlawful, *Clark Fork*, ¶ 21, the same standard of review applicable here. Thus, the "hard look" standard is to be utilized by the reviewing

24

government body—here, the Commission—and it is then up to the District Court to determine whether that "hard look" was in fact taken.

¶55 The governing body considering an application for a preliminary plat must consider "the impact on agriculture, agricultural water user facilities, local services, the natural environment, wildlife and wildlife habitat, and public health and safety . . . ." Section 76-3-608(3)(a), MCA; *see also Citizens*, ¶¶ 20-21. Section 76-3-603, MCA, sets forth the contents for an EA under the MSPA. It reads as follows:

> **Contents of environmental assessment.** When required, the environmental assessment must accompany the subdivision application and must include:
> (1) for a major subdivision:
> (a) a description of every body or stream of surface water that may be affected by the proposed subdivision, together with available ground water information, and a description of the topography, vegetation, and wildlife use within the area of the proposed subdivision;
> (b) a summary of the probable impacts of the proposed subdivision based on the criteria described in 76-3-608; and
> (c) a community impact report containing a statement of anticipated needs of the proposed subdivision for local services, including education and busing; roads and maintenance; water, sewage, and solid waste facilities; and fire and police protection; and
> (d) additional relevant and reasonable information related to the applicable regulatory criteria adopted under 76-3-501 as may be required by the governing body;
> (2) except as provided in 76-3-609, for a minor subdivision, a summary of the probable impacts of the proposed subdivision based on the criteria described in 76-3-608.

¶56 We conclude that the District Court did not err in concluding that the Commission's approval of the preliminary plat was unlawful for failure to provide available groundwater information as required under § 76-3-603(1)(a), MCA, and arbitrary and capricious for failure to consider surface pollution impacts created by the

25

subdivision. The EA noted that ground water in the project area ranged from 2 to 10 feet; however, a U.S.G.S. report on the shallow groundwater, as well as information from test wells, was not presented in the EA. The Landowners' expert Cerquone testified that the high groundwater in the project area needed to be studied in detail. Indeed, the Planning Board recommended rejection of the preliminary plat due to the high groundwater in the area. As the District Court noted, the EA simply does not provide available information on the high groundwater, and was inadequate with regards to potential impacts to both the groundwater and the Prickly Pear Creek. For instance, without knowing the specific depth of groundwater throughout the project site, Aspen Trails could conceivably place sewer pipes directly in the groundwater. The Commission, in approving the preliminary plat, had no way to evaluate whether or not this would occur, and what the resulting impacts would be, since the EA did not provide all "available information" regarding the groundwater. Accordingly, the District Court correctly concluded that the paucity of information regarding groundwater information prevented the Commission from taking a "hard look" at these impacts.

¶57 Similarly, we conclude the District Court did not err in determining that the Commission's decision to approve the preliminary plat without an assessment of impacts on groundwater and the Prickly Pear Creek from surface pollution was arbitrary and capricious. The EA did discuss the use of storm water ponds to control run-off. However, as stated by the District Court,

> Everyone agrees that the EA must summarize probable impacts to the environment. All witnesses agreed that the construction of 300+ homes in this subdivision will result in increases in herbicides, pesticides, and

other household materials in the area. Given the extremely high groundwater in this area, the nature of this possible pollution of the groundwater and its possible tie-in with Prickly Pear Creek should at least have been summarized and discussed in the EA.

¶58 Finally, we cannot conclude that the District Court's decision to void the preliminary plat was erroneous. In *Citizens*, we reversed a district court's decision to affirm a preliminary plat which had been approved by the Sanders County Board of County Commissioners. We did so based on our determination that the board had acted unlawfully in approving the plat. *Citizens*, ¶ 26. The District Court's remedy in this case is consistent with *Citizens* and the MSPA itself.

## CONCLUSION

¶59 For the foregoing reasons, we affirm the District Court's decision to void the preliminary plat for the Aspen Trails subdivision.

/S/ PATRICIA O. COTTER

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS

Justice Jim Rice, concurring.

¶60 I concur with Issues 1 and 2. I also concur with the Court's ultimate determination under Issue 3 to affirm the District Court, but for different reasons. I strongly believe the District Court erred in the procedure it undertook to review the challenge to the plat, and

27

that this Court should not condone it, as it upends the environmental assessment (EA) process—disrupting the right of agencies which use EAs to rely on them and the deference we are to accord the administrative process. I thus concur with Aspen Trail's argument in this regard. I begin with a discussion of general administrative law governing this issue, and conclude with this Court's jurisprudence.

¶61 In the seminal case of *Citizens to Preserve Overton Park, Inc. v. Volpe*, the United States Supreme Court held that a trial court's review of an administrative agency "is to be based on the full administrative record that was before the Secretary at the time he made his decision." 401 U.S. 402, 419-20, 91 S. Ct. 814, 825 (1971), *overruled on unrelated grounds*, *Califano v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980, 984 (1977). Because review is to be limited to the administrative record, the Court reversed the decisions of the lower circuit and district courts for relying on "litigation affidavits" presented by the petitioners in the district court. The Supreme Court termed such evidence "post hoc rationalizations" not part of the record serving as "the basis for review required by [the Administrative Procedure Act]." *Overton Park*, 401 U.S. at 419, 91 S. Ct. at 825 (citations omitted). The Court acknowledged that lower courts may "require the administrative officials who participated in the decision to give testimony explaining their action," but cautioned that "such inquiry into the mental processes of administrative decisionmakers is usually to be avoided," and certainly so "where there are administrative findings." *Overton Park*, 401 U.S. at 420, 91 S. Ct. at 825 (citations omitted).

¶62  In *Camp v. Pitts,* the Supreme Court again confronted a challenge to an agency's decision by use of extra-administrative record evidence. 411 U.S. 138, 93 S. Ct. 1241 (1973). In applying the 'arbitrary, capricious or unlawful' standard of review, the *Camp* Court unanimously held that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Further, the Court explained that, in the event the administrative record was so incomplete "as to frustrate effective judicial review, the remedy was not to hold a de novo hearing but, as contemplated by *Overton Park*, to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Camp*, 411 U.S. at 142-43, 93 S. Ct. at 1244. In *Fla. Power & Light Co. v. Lorion,* the Court also held that "if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation." 470 U.S. 729, 744, 105 S. Ct. 1598, 1607 (1985) (emphasis added).

¶63  The rules established in *Overton Park, Camp* and *Lorion* are recognized and well-understood by federal circuit and district courts, far too many to list here. *See e.g. Sierra Club v. U.S. Army Corps of Engrs.*, 772 F.2d 1043, 1052-56 (2nd Cir. 1985); *Cotton Petroleum Corp. v. U.S. Dept. of Int., Bureau of Indian Affairs*, 870 F.2d 1515, 1527-29 (10th Cir. 1989). Relying on *Overton Park* and *Camp,* the Ninth Circuit Court of Appeals has held that the 'predominant rule' is that "agency action must be examined by scrutinizing the administrative record at the time the agency made its decision." *Asarco,*

29

*Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir. 1980). Although *Asarco*—relied upon by this Court in *Skyline Sportsmen's Assn. v. Bd. of Land Commrs.*, 286 Mont. 108, 113, 951 P.2d 29, 32 (1997), discussed below—recognized that the trial court could review relevant evidence outside the administrative record in narrow circumstances, *Asarco*, 616 F.2d at 1160, it actually reversed the district court's decision to hear and consider extra-record evidence in that case as inappropriate. *Asarco*, 616 F.2d at 1161, 1163.

¶64    The Ninth Circuit has steadfastly applied *Overton Park* and *Camp* to hold "that courts reviewing an agency decision are limited to the administrative record," *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) (citing *Fla. Power & Light Co.*, 470 U.S. at 743-44, 105 S. Ct. at 1606-07), while also narrowing the exceptions for trial courts to admit extra-record evidence. The *Lands Council* Court stated that "if an Agency's administrative record is incomplete, we would expect litigants to seek to supplement the record in the agency . . . ." *Lands Council*, 395 F.3d at 1030 n. 10. The court noted the exceptions, which permitted district courts to admit extra-record evidence, were to be "narrowly construed and applied." *Lands Council*, 395 F.3d at 1030 (collecting cases); *see Voyageurs Natl. Park Assn. v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004) ("[t]hese exceptions apply only under *extraordinary circumstances;*" emphasis added). *Lands Council* explained that:

> The scope of these exceptions permitted by our precedent is constrained, so that the exception does not undermine the general rule. Were the [courts] routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the [courts] would be proceeding, in effect, de novo rather than with the proper deference to agency processes, expertise, and decision-making.

*Lands Council*, 395 F.3d at 1030.

¶65 While the above cases were applying the Administrative Procedure Act, 5 U.S.C. § 701 et seq., the logic of this approach is persuasive and has been mirrored in our own jurisprudence, both in Montana Administrative Procedure Act (MAPA) and non-MAPA cases. Under MAPA, administrative agency review is statutorily limited to the record. Section 2-4-704(1), MCA (2007) ("The review must be conducted by the court without a jury and must be confined to the record."). In *Clark Fork Coalition v. Mont. Dept. of Envtl. Quality*, we explained that our standards of review of agency decisions were "generally narrow," and that trial courts, pursuant to the statute, will "*carefully review[] the record* and satisfy[] themselves that the agency has made a reasoned decision." 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482 (quoting *Friends of the Wild Swan v. DNRC*, 2000 MT 209, ¶ 28, 301 Mont. 1, 6 P.3d 972; *Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861 (1989); emphasis added). Citing to Koch on *Administrative Law and Practice*, we held that trial courts must "examine[] the elements of the decision without interfering with the administrative authority over the decision itself." *Clark Fork*, ¶ 47 (citing Charles H. Koch, Jr., *Administrative Law and Practice* vol. 3, § 10.5, 39-40 (2d ed., West 1997)).

¶66 We looked to MAPA principles for non-MAPA cases, like the case before us today, when we reviewed the Flathead County Planning Board's decision in *North 93 Neighbors, Inc. v. Bd. of Co. Commrs. of Flathead Co.*, 2006 MT 132, 332 Mont. 327, 137 P.3d 557. In *North Fork Preservation Assn. v. Dept. of State Lands*, we examined the standards of review for administrative agency decisions not subject to MAPA, and

31

adopted the following standard: "whether *the record* establishes that the agency acted arbitrarily, capriciously, or unlawfully." 238 Mont. 451, 456-59, 778 P.2d 862, 865-67 (1989) (emphasis added). We cited our decision in *Langen v. Badlands Coop. State Grazing Dist.*, in which we held that "[t]he appeal from the commission to the district court is for the purpose merely of determining whether upon the evidence and the law the action of the commission is based upon an error of law, or is wholly unsupported by the evidence, or clearly arbitrary or capricious." *North Fork*, 238 Mont. at 457, 778 P.2d at 866 (citing *Langen*, 125 Mont. 302, 308, 234 P.2d 467, 470 (1951)). We explained that we look to the administrative record to review an agency's decision to honor the discretion given to the boards and commissions of this State, as authorized by the legislature. *North Fork*, 238 Mont. at 457, 778 P.2d at 866 (citing *Langen*, 125 Mont. at 308, 234 P.2d at 470). We did so in *Kiely Constr., L.L.C. v. City of Red Lodge*, affirming the district court's decision to exclude the City Council meeting minutes, as well as the testimony from the individual council members to explain their reasons for denying the preliminary subdivision plat application. 2002 MT 241, ¶¶ 96-97, 312 Mont. 52, 57 P.3d 836. We reasoned that the evidence was properly excluded because it "would constitute 'post-decision' statements, *which were not properly part of the record*." *Kiely*, ¶ 97 (emphasis added); *see also Citizens for Responsible Dev. v. Bd. of Co. Commrs. of Sanders Co.*, 2009 MT 182, ¶¶ 26-27, 351 Mont. 40, 208 P.3d 876 (reversing the district court's decision approving a preliminary plat based upon a review of the record).[1]

---

[1] If there can be any lingering doubt about the wisdom or correctness of the rule, commentators are unanimous in stating the general principle that "a court can engage in judicial review of an

¶67 The judicial function of reviewing administrative decisions by record review is tied to the limited scope of the 'arbitrary, capricious or unlawful' standard of review. This standard "communicates the least judicial role, short of unreviewability," and suggests a "restrained critical mood or a high tolerance for the *risk* of error." Charles H. Koch, Jr., *Administrative Law and Practice* vol. 3, § 10.4[1], 29 (2d ed., West 1997) (emphasis in original). Thus, "[e]xcept in a *de novo* review proceeding in which the court may take new testimony, review of agency action is limited to the record compiled by the agency." Stein, Mitchell & Mezines, *Administrative Law* vol. 5, § 43.02[7], 43-103 (LexisNexis 2007).

¶68 The District Court's approach was an unfortunate departure from these bedrock principles. The danger in this approach is that it rewards gamesmanship in the administrative process, here of subdivision plat approval. Landowners succeeded in ambushing Aspen Trails and the Commission by the use of extra-record evidence. Rather than participating in the agency process and providing their concerns about surface and

---

agency action based only on consideration of the record amassed at the agency" as a sound principle of administrative law. Richard J. Pierce, Jr., *Administrative Law Treatise* vol. II, § 11.6, 1047-54 (Wolters Kluwer Law & Business 2010); *see* 73A C.J.S. *Public Administrative Law and Procedure* § 346 (2004) (recognizing that "a court reviewing administrative action is limited to the record"). Koch, whom we cited for authority in *Clark Fork*, ¶ 47, states: "[i]t is black letter law that, except in the rare case, review in [the trial court] must be based on the record before the agency and hence a reviewing court may not go outside the administrative record." Charles H. Koch, Jr., *Administrative Law and Practice* vol. 2, § 8.27, 509 (2d ed., West 1997) (collecting cases); *see* Charles H. Koch, Jr., *Administrative Law and Practice* vol. 3, § 10.4[2], 35-36 (2d ed., West 1997) ("the court scrutinizes that body of information before the agency at the time it made the decision [and] Courts are not permitted to consider evidence outside that 'record;'" collecting cases); *see also* 2 Am. Jur. 2d *Administrative Law* § 545 (2004) ("judicial review of an administrative agency decision is limited to the administrative record [and the] court is restricted to the record made before the administrative agency . . . ;" collecting cases).

33

water pollution information to the Commission, Landowners opted to wait and fault the Commission before the District Court with extra-record evidence. Landowners' new expert testified in the District Court, offering information not presented to the Commission. The record demonstrates that the de novo hearing before the District Court was a battle of new scientific testimony over the adequacy and appropriateness of the EA. The District Court relied heavily on the testimony of the Landowners' expert to evaluate the Commission's decision, stating "Plaintiff's expert Chris Cerquone has a master of science degree in environmental studies[;] [h]e suggested monitoring wells throughout the property . . . . Cerquone felt that groundwater depth and flow information is critical to understand the potential impacts to groundwater and potential groundwater contamination of Prickly Pear Creek." Or. at 5-6. The District Court's approach allowed itself, and ultimately this Court, to be asked to act as scientific experts, judging and weighing the credibility and accuracy of new competing scientific testimony regarding the environmental impacts of subdivision plat construction. *See Lands Council*, 537 F.3d at 988. That is not the proper role for the District Court, or this Court.

¶69 The Court quietly approves the District Court's approach by citation to *Skyline*, a decision which failed to critically analyze the issue as well as it should have. As noted above, the *Asarco* case in which it relied was narrowly written, and the result in that case was a reversal of the district court's taking of new evidence. *Asarco*, 616 F.2d at 1161, 1163. Indeed, the commentaries treat *Skyline* as the exception to the general rule. *See* 2 Am. Jur. 2d *Administrative Law* § 545 n. 12 (2004); 73A C.J.S. *Public Administrative Law and Procedure* § 346 n. 6 (noting only *Skyline* as authority for taking new evidence

when reviewing under an arbitrary, capricious or unlawful standard). I agree with Judge Buyske's comments in *Skyline* that "the path the majority chose to take . . . runs too broadly through a factual analysis and invites future litigants to view district court proceedings as a means to do what should have been done at the administrative agency level—develop the record." *Skyline*, 286 Mont. at 116-17, 951 P.2d at 34 (Buyske, J., dissenting).

¶70  I believe the District Court reached the correct conclusion, but believe the conclusion could have been well-reached by properly reviewing the administrative record. Because I agree that the Commission failed to consider the environmental impacts related to surface pollution and possible groundwater contamination, in violation of statutory requirements, I concur with the Court and would affirm.


/S/ JIM RICE


Justice James C. Nelson specially concurs.

¶71  I specially concur in the Court's Opinion, although I also agree with Landowners' argument, on brief, that Aspen Trails' motion to intervene after judgment was untimely. Read together, our cases hold that post-judgment motions to intervene are generally disfavored and that once the litigation has commenced and the potential intervenor has had notice and the opportunity to move to intervene, but fails to do so, then intervention after the litigation has concluded and judgment entered is untimely and should be denied.

*See Connell v. Dept. of Social and Rehab. Serv.*, 2003 MT 361, 319 Mont. 69, 81 P.3d 1279, and the cases collected and discussed therein.

¶72 Here, on the basis of our well-established jurisprudence, the trial court could have and, in my view, should have, denied Aspen Trails' untimely motion to intervene. In doing so, the court would have saved the Landowners the time, trouble and expense of defending this appeal. I also agree with Justice Rice's discussion on the District Court taking new evidence.

¶73 That said, however, I concur in the ultimate result reached by the Court in this case.

/S/ JAMES C. NELSON

Justice W. William Leaphart, dissenting.

¶74 I dissent. In my view, the District Court erred in granting Aspen Trail's post-judgment motion to intervene under M. R. Civ. P. 24.

¶75 Although there is nothing in Rule 24 that precludes post-judgment intervention, such motions are not favored. *In re C.C.L.B.*, 2001 MT 66, ¶ 24, 305 Mont. 22, 30, 22 P.3d 646, 651. "[T]here is 'considerable reluctance on the part of courts to allow intervention after the action has gone to judgment and a strong showing will be required of the applicant. Motions for intervention after judgment ordinarily fail to meet this exacting standard and are denied.'" *St. Charles Tower, Inc. v. County of Franklin*, 2010 WL 743594 (E.D. Mo. Feb. 25, 2010) (citing *Hillside Enter., Inc. v. Carlisle Corp.*, 944

F. Supp. 793, 798 (E.D. Mo. 1996)); Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* vol. 7A § 1916.

¶76 This Court has looked to four factors in evaluating the timeliness of a motion to intervene: (1) the length of time the intervenor knew or should have known of its interest in the case before moving to intervene; (2) the prejudice to the original parties, if intervention is granted, resulting from the intervenor's delay in making its application to intervene; (3) the prejudice to the intervenor if the motion is denied; and (4) any unusual circumstances mitigating for or against a determination that the application is timely. *In re C.C.L.B.* at ¶ 24. Here, where Aspen Trails knew of the litigation during the formative stages, and yet waited until after judgment was entered to seek intervention, it has failed under the first factor. When advised early on of the prospect of litigation, Aspen Trails assumed the position that the dispute was between Plaintiffs and the City. Aspen Trails knew before trial that its Environmental Assessment was going to be the subject of the trial and that its preliminary plat might be voided. Despite being on notice that its interests were at stake, Aspen Trails did nothing. It was only after defense of the litigation had been conveniently financed by taxpayer money and the City Commission decided not to appeal the adverse judgment that Aspen Trails determined that it actually had an interest in the outcome.

¶77 Given my view that the District Court abused its discretion in allowing Aspen Trails to intervene as an appellant, I would not reach the merits of the appeal.

/S/ W. WILLIAM LEAPHART

37