CHIEF JUSTICE TURNAGE
delivered the Opinion of the Court.
The District Court for the First Judicial District, Lewis and Clark County, granted Defendants’ motion for summary judgment and denied Plaintiffs’ request for a preliminary injunction, dismissing a challenge to a proposed land exchange between the Board of Land Commissioners and Turner Enterprises, Inc. We vacate and remand.
The dispositive issue is whether the District Court erred by granting summary judgment because Plaintiffs raised genuine issues of material fact.
Background
The Board of Land Commissioners (Board) is one of a handful of boards established by the Montana Constitution. The Board has direct constitutional authority to lease, exchange, and sell state trust lands.
The governor, superintendent of public instruction, auditor, secretary of state, and attorney general constitute the board of land commissioners. It has the authority to direct, control, lease, exchange, and sell school lands and lands which have been or may be granted for the support and benefit of the various state educational institutions, under such regulations and restrictions as may be provided by law.
Article X, Section 4, Mont. Const. In addition, Article X, Section 11(4), Mont. Const., provides:
All public land shall be classified by the board of land commissioners in a manner provided by law. Any public land may be exchanged for other land, public or private, which is equal in value and, as closely as possible, equal in area.
Section 77-1-202(1), MCA, echoes the constitutional authority of the Board. It states:
*111 The board shall exercise general authority, direction, and control over the care, management, and disposition of state lands and, subject to the investment authority of the board of investments, the funds arising from the leasing, use, sale, and disposition of those lands or otherwise coming under its administration. In the exercise of these powers, the guiding principle is that these lands and funds are held in trust for the support of education and for the attainment of other worthy objects helpful to the well-being of the people of this state as provided in The Enabling Act. The board shall administer this trust to secure the largest measure of legitimate and reasonable advantage to the state.
In 1993, Turner Enterprises, Inc. (Turner), submitted a proposal to the Board to exchange state school trust land located within the boundaries of Turner’s Flying D Ranch southwest of Bozeman, Montana, for private land Turner owned elsewhere in Montana. The original proposal was to exchange 7,486 acres of state land within the Flying D Ranch for 12,689 acres of land Turner owned within the Snowcrest Ranch south of Alder, Montana, and the Ulm Pishkun southwest of Great Falls, Montana. The Department of Natural Resources and Conservation (Department) reviewed the proposal and recommended that it be rejected as not assuring a “good deal” for the State when all attributes of the state lands were evaluated against the land proposed for state acquisition.
Turner then modified its proposal by deleting from the proposed exchange two sections of state lands within the Flying D Ranch. As modified, the proposal was to exchange 6,167 acres of state land for 12,689 acres of private land. On April 15, 1996, after review by the Department, solicitation of public comment, and preparation of an environmental assessment (EA) as required under the Montana Environmental Policy Act, §§ 75-1-101 through -324, MCA, the Board approved the modified proposal.
The plaintiff organizations of recreationists and sportsmen brought this declaratory judgment action arguing that the Board had overstepped its lawful discretion under the Montana Constitution because it did not exchange the state land “under such regulations and restrictions as may be provided by law.” Article X, Section 4, Mont. Const. Specifically, Plaintiffs argued that the Board did not comply with § 77-2-203(2), MCA:
If the requirements of subsection (1) and 77-2-204 are met, state lands bordering on navigable lakes and streams or other bodies of water with significant public use value may be exchanged for *112 private land if the private land borders on similar navigable lakes, streams, or other bodies of water.
The two most significant bodies of water on the private land owned by Turner are Ledford Creek and Robb Creek, both of which are located on the Snowcrest Ranch. Cherry Creek and Spanish Creek are the two most significant bodies of water on the state land proposed for exchange. Plaintiffs argued that while Cherry Creek and Spanish Creek are streams with significant public use value, Ledford Creek and Robb Creek are not.
The Plaintiffs pointed out that throughout the process of approving the land exchange, the Board told them that § 77-2-203(2), MCA, did not apply because “there are no state lands bordering on a navigable lake or stream included in this proposed exchange.” Only on June 17, 1996, after Plaintiffs had filed this action, did the Board make supplementary findings on § 77-2-203(2), MCA, including a finding that Robb Creek and Ledford Creek have “the potential to provide significant public use value.”
MonTRUST, a non-profit citizens’ organization promoting the protection, advancement and appropriate use of Montana’s school trust lands on behalf of public education, was granted leave to intervene before the District Court. The Defendants moved to dismiss the action or, in the alternative, for summary judgment. Intervenors moved for summary judgment as well, while Plaintiffs moved for a preliminary injunction to prevent the exchange from proceeding during the pendency of this lawsuit. At a hearing on all of the pending motions, the attorneys for the parties and for the Intervenors made oral argument. Additionally, Plaintiffs presented testimony of five witnesses concerning the comparability of the bodies of water on the lands proposed for exchange.
In a memorandum and order entered after the hearing, the court found that the Plaintiffs had standing to bring this action but that the Board had adequately considered the requirements set forth at § 77-2-203(2), MCA. Accordingly, the court granted the Defendants’ motion for summary judgment and denied the Plaintiffs’ motion for a preliminary injunction.
Discussion
Did the District Court err by granting summary judgment because Plaintiffs raised genuine issues of material fact?
Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a *113 matter of law. Rule 56(c), M.R.Civ.P. This Court’s standard of review of a summary judgment is the same standard as that employed by the district court — whether there are genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Missoula Rural Fire Dist. v. City of Missoula (1997), [283 Mont. 113], 938 P.2d 1328, 1329.
The standard of review of an informal administrative decision is whether the decision was arbitrary, capricious, or unlawful. North Fork Pres. v. Dept. of State Lands (1989), 238 Mont. 451, 458-59, 778 P.2d 862, 867. It was appropriate for the District Court, in applying that standard, to accept new evidence and not to limit its review to the administrative record. In a proceeding to determine whether an agency decision was arbitrary, capricious, or unlawful, unless the reviewing court looks beyond the record to determine what matters the agency should have considered, it is impossible for the court to determine whether the agency took into consideration all relevant factors in reaching its decision. ASARCO, Inc. v. U.S.E.P.A. (9th Cir. 1980), 616 F.2d 1153, 1160.
Combining the two applicable standards of review, the question before the District Court and this Court is whether the Plaintiffs have established a genuine issue of material fact as to whether the Board’s decision was arbitrary, capricious, or unlawful.
In their brief and at oral argument, the Defendants pointed out that under Montana’s stream access law at § 23-2-302(1), MCA, the effect of the proposed land exchange on the availability of Cherry Creek and Spanish Creek to recreationists will merely be fewer points of access; recreationists will retain the right to use the creeks. A condition to the exchange would be that public access to the creeks would be maintained at legal access points. The Defendants also point out the “world-class hunting opportunities” on the Snowcrest Ranch, now privately-owned, but which would become state land. The Defendants explain that a multitude of factors entered into the evaluation of whether the exchange serves the interests of the school trust beneficiaries and provides recreational opportunities for the public.
Similarly, the Intervenors argue that the Board’s fiduciary duty to the trust beneficiaries mandates approval of this proposed land exchange because the exchange will result in greater income to the beneficiaries, which the Intervenors argue is the only purpose of the trust. As a result of the exchange, the trust corpus would gain $217,438 in value plus a projected additional $6,577 in annual income from hunting fees and agricultural and grazing leases.
*114 However, neither the Board’s fiduciary duty to the trust beneficiaries nor the other factors which entered into its decision on this proposed land exchange relieves the Board of its constitutional obligation to follow the “regulations and restrictions” imposed by the Legislature on proposed land exchanges, including those found in § 77-2-203(2), MCA. We must presume that the Montana Legislature understood the effect of its action in passing § 77-2-203(2), MCA, a “regulation and restriction” which may constrict the Board’s discretion in managing state trust land. See Rider v. Cooney (1933), 94 Mont. 295, 310, 23 P.2d 261, 264 (“[t]he legislature is presumed to act, so far as mere questions of policy are concerned, with full knowledge of the facts upon which its legislation is based, and its conclusions on matters of policy are beyond judicial consideration”). The Board cannot ignore the requirements set forth at § 77-2-203(2), MCA, simply because it believes that it otherwise received a “good deal” from the proposed exchange.
The Board based its finding that Robb Creek and Ledford Creek have “the potential to provide significant public use value” on the following factors:
(a) The exchange would result in additional mileage of stream
ownership than currently owned by the State;
(b) These creeks can provide good sport fisheries to the public; and
(c) Robb Creek contains a highly pure strain of native cutthroat trout which is largely absent in either Cherry Creek or Spanish Creek.
As a preliminary matter, we note that § 77-2-203(2), MCA, refers to “significant public use value,” not potential for significant public use value.
The statement that Robb Creek and Ledford Creek had the potential to provide significant public use value was buttressed first by the Board’s finding that the lands to be received in the proposed exchange had more miles of streams. Additional stream mileage alone does not equate to significant public use value.
The Plaintiffs point out that the EA of Robb Creek and Ledford Creek indicated high levels of erosion and siltation, low fish numbers, and almost no public use. The EA discussed electroshock surveys undertaken by the Department of Fish, Wildlife & Parks (DFWP). According to the DFWP’s 1991 electroshock survey, Ledford Creek contained approximately ten brown trout and five rainbow trout for every 1,000 feet of stream and Robb Creek contained thirty-seven *115 brook trout and five westslope cutthroat trout per 1,000 feet of stream. In contrast, an electroshock survey undertaken on upper Cherry Creek showed 237 rainbow trout and twenty-five brown trout; and on lower Cherry Creek, 164 brown trout, 128 rainbow trout, and twenty-six mountain whitefish per 1,000 feet of stream.
Further, while the EA asserted that Robb Creek and Ledford Creek were important spawning areas for fish living in the Ruby River, the Plaintiffs presented contrary testimony at the District Court hearing. The two DFWP fisheries biologists upon whose study this assertion in the EA was based, Messrs. Brammer and Oswald, testified that their studies did not cover Ledford Creek and Robb Creek but had focused instead on areas of the Ruby River upstream. Brammer, to whom the EA attributed a statement that these creeks were important spawning areas, stated that he could not agree with the statement attributed to him “because I don’t have any evidence that would suggest that’s the case.” Oswald testified that he did not find any evidence of spawning from Ruby River into Robb Creek and that any claim that Ledford Creek and Robb Creek are important spawning areas “could not be supported by the current evidence that we have.”
The EA described Ledford Creek as “a good sport fishery with management potential.” However, both Brammer and Oswald testified before the District Court that significant problems, including sedimentation, may prevent the development of Robb Creek and Ledford Creek as sport fisheries. Furthermore, Oswald testified that DFWP had absolutely no evidence from field reports or otherwise of anyone fishing in Robb Creek or Ledford Creek.
The Plaintiffs presented several witnesses who testified that Spanish Creek and Cherry Creek are excellent sport fisheries but that Robb and Ledford Creeks are not. Among others, William Fairhurst, a retired military pilot and avid outdoorsman, stated by affidavit that both Spanish Creek and Cherry Creek are “pristine blue ribbon trout streams with as good of fishing as can be found in the state.” He stated that, in contrast, “Ledford Creek and Robb Creek contain insignificant water flow compared to Spanish Creek and Cherry Creek, and, in fact, they are not rehable for fishing and water throughout the year.”
The Board’s supplemental findings further stated that Robb Creek contains a highly pure strain of westslope cutthroat trout largely absent in either Cherry Creek or Spanish Creek. The Plaintiffs presented evidence to the District Court on this point as well. Brammer testified that a recovery program for westslope cutthroat trout in Robb Creek would be speculative because of habitat degradation *116 and a relatively higher density of the competitive brook trout. DFWP had no management plan in place for developing the westslope cutthroat trout population in Robb Creek, and none was proposed at the time of the hearing.
Additionally, at the hearing before the District Court, the Plaintiffs’witnesses raised valid questions about the extent to which access to Cherry Creek and Spanish Creek would be available to the public under the stream access law. All of the above factual issues must be viewed against the backdrop of a Board which maintained during its decisionmaking process that § 77-2-203(2), MCA, did not apply to this proposed exchange, but when faced with this lawsuit abruptly changed its position and belatedly adopted findings relating to significant public use of the waters involved.
We conclude that Plaintiffs should be accorded an opportunity through full discovery to explore the factual basis, or lack thereof, for the Board’s finding that Robb Creek and Ledford Creek constitute bodies of water with significant public use values. The Plaintiffs have raised genuine issues of material fact as to whether Robb Creek and Ledford Creek are streams with significant public use value, including: whether a “potential to” provide significant public use value is equivalent to providing significant public use value; the weight, if any, to be accorded an increase in stream mileage under state ownership as a result of the land exchange; the significance of the Robb Creek westslope cutthroat trout population in light of the other facts and circumstances; and the truth of the claim in the EA that Ledford Creek can provide a good sport fishery to the public. Because of these issues of fact, we hold that a material issue of fact exists as to whether the Board’s decision approving the proposed land exchange was arbitrary, capricious, and unlawful. Summary judgment was therefore improper.
Having determined that the District Court erred in granting summary judgment for the Board, we need not reach the other issues raised on appeal. We vacate the summary judgment and remand to District Court for further proceedings consistent with this Opinion.
JUSTICES HUNT, NELSON, REGNIER and TRIEWEILER concur.