FILED

02/22/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0117

DA 21-0117

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 38

HENRY and DIANE BELK,

      Plaintiffs and Appellants,

   v.

MONTANA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
an agency of the State of Montana,
and GLACIER STONE SUPPLY, INC.,

      Defendants and Appellees.

APPEAL FROM:   District Court of the Eleventh Judicial District,
               In and For the County of Flathead, Cause No. DV-15-2019-328-D
               Honorable Dan Wilson, Presiding Judge

COUNSEL OF RECORD:

       For Appellants:

            David K. W. Wilson, Jr., Morrison Sherwood Wilson & Deola, Helena,
            Montana

            Bruce A. Fredrickson, Rocky Mountain Law Partners, P.C.,
            Kalispell, Montana

       For Appellee Montana Department of Environmental Quality:

            Edward Hayes, Staff Attorney, Department of Environmental Quality,
            Helena, Montana

       For Appellee Glacier Stone Supply, Inc.:

            Mark L. Stermitz, Danielle A.R. Coffman, Crowley Fleck PLLP,
            Missoula, Montana

            Darrell S. Worm, Ogle, Worm & Travis, PLLP, Kalispell, Montana

Submitted on Briefs:  December 15, 2021

Decided:  February 22, 2022

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Henry and Diane Belk appeal a December 4, 2020 summary judgment order from the Eleventh Judicial District Court in Flathead County. That order affirmed a decision by the Montana Department of Environmental Quality (DEQ) to issue a mining permit to Glacier Stone Supply, Inc.[1] The Belks also appeal the District Court's May 1, 2020 order denying their motion to supplement the administrative record.

¶2 We restate the issues on appeal as follows:

*Issue One: Did the District Court err in its interpretation of a Montana Environmental Policy Act provision concerning regulatory impacts on private property rights?*

*Issue Two: Did the District Court err in granting summary judgment to DEQ on its compliance with the Montana Environmental Policy Act?*

*Issue Three: Did the District Court err in denying the Belks' motion to supplement the record?*

¶3 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Glacier Stone Supply extracts architectural and landscaping stone from a quarry it operates in Flathead County. The quarry sits on a small ridgetop about one mile from Little Bitterroot Lake and several miles northwest of Marion. Glacier Stone leases the quarry sites from the landowner, William Jarvis. To comply with Montana's Metal Mine Reclamation Act (MMRA), Jarvis had filed a "Small Miner Exclusion Statement" (SMES)

---

[1] The State of Montana, through the Office of the Attorney General, appeared in the matter below as an intervenor to defend a statutory provision from constitutional challenge. The District Court did not ultimately reach that matter, so the State makes no appearance on appeal and has been removed from the caption in this case.

for his property, which described two sites, the "Upper" and "Lower" Canyon Creek Quarries. Under the MMRA, operators that disturb less than five acres are exempt from permitting requirements as long as they file an SMES. Section 82-4-303(30), MCA.

¶5 DEQ sent Glacier Stone and Jarvis a violation letter in 2016. They could not qualify for the "small miner" exception because the two sites were less than one mile apart and together disturbed more than 10 acres. Section 82-4-303(30)(a)(ii), MCA. DEQ offered two corrective options: Glacier Stone could either reclaim one entire site and enough of the second site to bring it under five disturbed acres, or it could apply for a full operating permit under the MMRA and its reclamation standards.

¶6 Glacier Stone submitted a permit application in 2017. It proposed a quarry operation that would disturb approximately 35 total acres over a 25-year span. This would include removing the ridgetop's upper 50 feet or so of rock. In the process of reviewing the application, DEQ prepared an Environmental Assessment (EA) under the Montana Environmental Policy Act (MEPA). After completing its Final EA, DEQ approved the permit.

¶7 Glacier Stone accesses the lower quarry from the west. There, a dirt road climbs from Pleasant Valley Road about a mile and a half up to the northeast corner of the Jarvis property. The road is described in a reciprocal easement agreement executed by Jarvis and the neighboring property owner, Trudeau, in 2007. The agreement provided Jarvis (and successors) unrestricted access to his property via the road. It also provided Trudeau (and successors) unrestricted use of another road cutting south through part of Jarvis's property to reach a higher-elevation part of the neighboring parcel.

4

¶8    Henry and Diane Belk live in Marion and oppose Glacier Stone's operation. They submitted comments to DEQ regarding its MEPA analysis of the mine permit proposal, detailing their concerns. They raised issues regarding impacts to air, water, and wildlife, and they questioned the adequacy of the reclamation plans and Glacier Stone's likelihood of compliance. The Belks also stressed that a fully permitted quarry would affect life on the lake, deteriorating the view and interrupting the peace and quiet.

¶9    In 2013, the Belks bought a parcel of land bordering the quarry property to the northeast. Then, as Glacier Stone's permit process was underway in 2017 and 2018, they acquired the rest of the parcels surrounding Jarvis's. The access easement by which Glacier Stone's vehicles reach the lower quarry now transects one of the Belk properties. In their comments on the EA, the Belks called on DEQ to conduct a fuller analysis of how the proposal would impact their property rights. The Belks described the easement they now owned—across part of Jarvis's property in the reciprocal agreement—as one that cut "through the middle of the mine." They complained that Glacier Stone was blocking them access to use their easement.

¶10   In its response to the Belks' comments, DEQ noted that it had no authority to adjudicate a private property dispute about enforcing an easement. Then, DEQ acknowledged that standards in the MMRA require it to ensure that the reclamation plan under a permit would protect public safety. DEQ thus reviewed the reciprocal easement agreement to consider whether it gave the Belks access within the mine site, which could raise safety concerns. The 2007 agreement included a map depicting the road to Jarvis's

5

property and the road to the upper part of Trudeau's (now the Belks') land to the south. DEQ concluded that this second road did not in fact go through the mine site.

¶11 The Belks also cited a provision of MEPA, § 75-1-201(1)(b)(iv)(D), MCA, which requires DEQ to consider in its assessment "any regulatory impacts on private property rights." The Belks commented that DEQ's EA for the Glacier Stone permit failed to account for impacts to *their* property rights. DEQ responded by saying it read this provision as requiring it to consider effects on the *regulated* property rights, i.e., those of the applicant. Because it was not regulating use of the Belks' or any other neighbors' properties, DEQ said it did not need to do any further assessment under that provision.

¶12 After DEQ approved Glacier Stone's permit, the Belks filed a lawsuit in District Court in Flathead County. They alleged that DEQ had violated MEPA, the MMRA, and the Montana Constitution. The District Court consolidated the Belks' case with a lawsuit from two other neighbors who also challenged DEQ's decision. DEQ filed its administrative record in District Court, and the Belks and the other plaintiffs subsequently filed a motion to supplement that record with additional materials. They wanted the record to include documents covering Glacier Stone's history of SMES noncompliance, such as the violation letters DEQ sent that prompted the permit application.

¶13 DEQ opposed the motion to supplement the record. DEQ argued that the Final EA in the record it filed adequately included the facts of the violation leading to the proposal, and DEQ noted that its MEPA and MMRA tasks were focused only on assessing the proposed action, foreclosing decision-making based on past violations or speculation about future violations. The District Court denied the Belks' motion.

¶14     The parties each filed summary judgment motions, and the District Court held a hearing in October 2020. In an order issued December 4, 2020, the District Court granted summary judgment to DEQ and Glacier Stone and dismissed the complaints. The Belks now appeal. They argue that the District Court erred in granting summary judgment to DEQ because the MEPA provision noted above should be construed to apply to their property and because DEQ's MEPA analysis was inadequate. They also argue that the District Court should have granted their motion to supplement the record.

**STANDARD OF REVIEW**

¶15     We review summary judgment rulings de novo. *Thornton v. Flathead Cty.*, 2009 MT 367, ¶ 13, 353 Mont. 252, 220 P.3d 395. Our review of agency practices under MEPA considers whether the agency's actions were unlawful, arbitrary, or capricious. *Bitterrooters for Planning, Inc. v. Mont. Dep't of Envtl. Quality*, 2017 MT 222, ¶ 15, 388 Mont. 453, 401 P.3d 712. An agency decision is unlawful if it does not comply with governing laws and administrative rules. *North Fork Preservation Ass'n v. Dep't of State Lands*, 238 Mont. 451, 464, 778 P.2d 862, 870 (1989). We give "respectful consideration" to an agency's statutory interpretation but are not bound to defer to it. *Mont. Power Co. v. Mont. Public Serv. Comm'n*, 2001 MT 102, ¶ 25, 305 Mont. 260, 26 P.3d 91. An agency decision is arbitrary and capricious if it was clearly erroneous, was made without consideration of relevant factors, or was "unreasonable or seemingly unmotivated based on the existing record." *Montana Wildlife Fed. v. Mont. Bd. of Oil & Gas Conserv.*, 2012 MT 128, ¶ 25, 365 Mont. 232, 280 P.3d 877.

**DISCUSSION**

¶16 *Issue One: Did the District Court err in its interpretation of a Montana Environmental Policy Act provision concerning regulatory impacts on private property rights?*

¶17 MEPA is a broad-reaching law that requires state agencies in Montana to conduct analyses of contemplated actions that may impact the environment—like approving a mining permit. *Bitterrooters for Planning*, ¶¶ 17-18; §§ 75-1-102, -201(1), -220(5), MCA. MEPA is modeled after the federal National Environmental Policy Act and imposes a procedural onus on the state to take a "hard look" at the potential environmental consequences of proposed measures. *Ravalli Cty. Fish & Game Ass'n v. Mont. Dep't of State Lands*, 273 Mont 371, 377, 903 P.2d 1362, 1366 (1995). The law provides a list of things that its environmental reviews must include a "detailed statement on." *See* § 75-1-201(1)(b)(iv), MCA. At the top of the list sit topics like environmental impacts, unavoidable adverse effects, and available alternatives. Section 75-1-201(1)(b)(iv)(A)-(C), MCA. Then, the law requires the analysis to balance this environment-focused detail with statements regarding things like resource commitments, consumer fiscal impacts, benefits of a proposal, and "regulatory impacts on private property rights." Section 75-1-201(1)(b)(iv)(D)-(H), MCA.

¶18 That last topic, "regulatory impacts on private property rights," is required by § 75-1-201(1)(b)(iv)(D), MCA.[2] An agency action like DEQ's decision to approve Glacier

---

[2] The parties have not cited nor have we found any existing caselaw interpreting this specific provision of the Montana Environmental Policy Act, and thus we consider this to be a case of first impression on the matter.

8

Stone's mining permit will certainly have a regulatory impact on the property that Glacier Stone leases from Jarvis because the conditions of the permit constrain the scope of the mining activity and come with required reclamation and other mitigation measures. In its Final EA, DEQ addressed this topic and stated that "the permit conditions are reasonably necessary to ensure compliance [with the MMRA] . . . or have been agreed to by the applicant."

¶19 In their comments to DEQ about the EA, the Belks complained that this analysis of regulatory impacts was insufficient. The Belks argued that DEQ should also have addressed how the permit approval would impact *their* property rights, not just those of Glacier Stone and Jarvis. According to the Belks, there are two reasons to extend the property regulation analysis: first, because their property and Glacier Stone's are "intertwined"; and second, because the broad design of MEPA should warrant reaching into such indirect effects on neighboring property.

¶20 The Belks' first argument relies on an overstatement of their property interests and thus falls short. In order to have property rights that are *regulated* and thus subject to this part of MEPA's required analysis, something about DEQ's considered action would need to involve regulatory control or constraints on Belk property. The Belks argued in their comments on the EA, in District Court, and in their briefing before this Court that they own an access easement that goes *through the mine site*. Thus, they say, DEQ's decision has a direct regulatory impact on their property rights by affecting this access. However, in responding to their comment, DEQ noted that it reviewed the easement documents, which were executed by Jarvis and a prior landowner, and did not believe the access overlapped

9

the quarry. The Belks have continued to state—without further detail or explanation—that their easement does cross the mine, but they offer no evidence to refute DEQ's analysis and response. Instead, the Belks shift to their second argument, that assessment of "regulation of private property rights" should extend to neighboring properties, not just those that are the subject of the regulation.

¶21 The problem with the Belks' second argument is that it conflates regulatory impacts on private property rights with environmental impacts. As DEQ points out, the clause requiring it to assess regulation on private property rights is clearly tied to the Legislature's statement of purpose in § 75-1-102(2), MCA—that MEPA should, in addition to promoting environmental welfare, help avoid "undue government regulation" on the use of private property. And as noted above, in the context of DEQ's permitting decision here, there is no governmental regulation under consideration that would apply to the Belks' use of their property.

¶22 The Belks point instead to MEPA's environmentally focused purposes, and they argue that viewed in light of these aims,[3] the private property clause should be construed to concern any impacts on neighboring property. However, when the Belks describe these impacts, they cite things like traffic, dust, and sediment in storm water. These are clearly *environmental* impacts, already addressed in detail in other sections of the EA that already

---

[3] *See* § 75-1-102, MCA ("The Legislature, mindful of its constitutional obligations [toward the environment], has enacted the Montana Environmental Policy Act . . . to declare a state policy that will encourage productive and enjoyable harmony between humans and their environment . . . to promote efforts that will prevent, mitigate, or eliminate damage to the environment and biosphere . . . .").

consider areas surrounding the permit site. For example, if DEQ reviews a plan that involves wastewater entering a stream that runs to neighboring properties, analysis of these effects is clearly required by § 75-1-201(1)(b)(iv)(A), MCA (environmental impacts), and DEQ's implementing regulations at Admin. R. M. 17.4.608(1)(a) ("severity, duration, geographic extent") and 17.4.609(3)(d)-(e) ("cumulative and secondary impacts").

¶23 The Belks do not explain why the section on property rights regulation needs to re-hash these concerns; instead, they simply recast these environmental concerns as property-rights-related in the hopes that their status as the neighboring landowner on all Glacier Stone's borders will afford them special status in the analysis of the permit application. This argument misconstrues the plain and unambiguous language in § 75-1-201(1)(b)(iv)(D), MCA, which clearly addresses *regulatory* impacts on private property rights, i.e., those of the regulated property or the applicant. To read the clause as the Belks do, as another provision concerned with downstream environmental effects on neighboring properties, would be to ignore the "regulatory" qualifier and make it redundant with the preceding requirements and therefore superfluous. "We are required to avoid any statutory interpretation that renders any sections of the statute superfluous and does not give effect to all of the words used." *State v. Berger*, 259 Mont. 364, 367, 856 P.2d 552, 554 (1993). Thus, the District Court did not err in its conclusion that DEQ's assessment was sufficient under § 75-1-201(1)(b)(iv)(D), MCA.

11

¶24    *Issue Two: Did the District Court err in granting summary judgment to DEQ on its compliance with the Montana Environmental Policy Act?*

¶25    The Belks also contend that DEQ's environmental analysis was insufficient under MEPA. Below, they raised arguments about such concerns as water and air quality, which the District Court addressed in detail. On appeal, the Belks focus solely on aesthetic and recreational environmental impacts—how the quarry will affect the quietude and nature of life on the lake—and they argue that the District Court erred in finding DEQ's analysis compliant with MEPA.

¶26    Our concern when reviewing an assessment under MEPA is whether the agency made a reasoned decision after carrying out its MEPA responsibilities in full. *Clark Fork Coalition v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482. "Implicit in the requirement that an agency take a hard look at the environmental consequences of its actions is the obligation to make an adequate compilation of relevant information, to analyze it reasonably, and to consider all pertinent data." *Clark Fork Coalition*, ¶ 47. Among the environmental consequences that DEQ must address under MEPA are aesthetic and recreational impacts. *See* Admin. R. M. 17.4.609(d) (2021).

¶27    DEQ's statements about these topics in the EA included noting that the upper 50 feet of rock would eventually be removed from the ridgetop and that the disturbance on the mine site would be visible from the lake during the life of the permit as well as afterwards as vegetation is slowly reestablished. DEQ determined that "the visual disturbance would not dominate the landscape," especially given the presence of larger hills surrounding the quarry. DEQ discussed noise impacts from the mine and noted that they would be "greater

12

than typical operations, but very limited in frequency. . . . The noise levels in the area would be essentially the same as the noise levels that have existed with ongoing operations[.]" Regarding recreation, DEQ stated that some activity and noise would be apparent from the lake but that "secondary impacts to access and quality of recreational activities would be minimal due to the limited scope of the project and the distance" from the lake. In response to comments on the EA, DEQ discussed in greater detail the quantity of noise from Glacier Stone's periodic potential blasting of rock.

¶28 The Belks argue that all this discussion does not qualify as a "hard look" at the aesthetic and recreational impacts of the permit approval. They contend that the factors described above constitute significant impacts that warranted fuller, more quantitative analysis, and that DEQ acted arbitrarily and capriciously in limiting its analysis to these passages in an EA. The Belks argue that DEQ failed to expand on the extent to which residents and visitors would be impacted, and they argue that DEQ should have included more data on things like the recreation economy and property values.

¶29 However, the Belks point to no authority for the notion that such impacts must be assessed in quantitative economic terms. In fact, while doing so may be helpful in some circumstances, DEQ's MEPA-implementing regulations contain no such directive. The agency's rules detailing the requirements of an EA call for "narrative" descriptions of evaluated impacts, and the subject of "aesthetics" is a subcomponent of impacts on the physical environment—not the recreation economy. Admin. R. M. 17.4.609(3)(d) (2021). The rules also require assessments of impacts on human populations—including health, agriculture, tax bases, and culture—but they do not require quantitative economic

13

forecasts. Admin. R. M. 17.4.609(3)(e) (2021). Discussion of "access to and quality of recreational and wilderness activities" is a listed requirement, but the Belks do not explain what DEQ was missing when it discussed how the visible and audible presence of the mine might qualitatively affect recreation, views, and the like. The property value or recreation forecasts the Belks seek might represent uncertain downstream economic effects, but they would capture no greater information about the aesthetic and environmental impacts than DEQ already considered when it detailed the extent of the quarry's visual and aural presence from the lake. The EA contained sections dedicated specifically to aesthetics, to recreation, and to human health and safety, and these analyses combined with DEQ's responses to comments adequately covered the subjects.

¶30    The aim of DEQ's assessment in an EA is to evaluate the individual and cumulative impacts of a proposed action and determine their significance; if a proposal would have a significant impact on the environment, then a full "Environmental Impact Statement," with even greater analysis than an EA, is required. *Mont. Wildlife Fed'n*, ¶ 44; Admin. R. M. 17.4.608 (2021). Here, DEQ determined in preparing its EA that Glacier Stone's permit approval would not have such a significant level of impact.

¶31    DEQ has promulgated rules establishing criteria for reaching such a decision under MEPA. Among the factors that it must consider are "the severity, duration, geographic extent, and frequency" of impacts. Admin. R. M. 17.4.608(1)(a) (2021). Thus, a relevant question in reviewing DEQ's approach here is to determine whether the agency complied with its implementing regulations and whether the information it collected and discussed was indeed sufficient to make its finding of no significant impact reasonable. Regarding

14

noise, recreation, and aesthetics, DEQ adequately considered each of the relevant factors and made a reasonable determination. DEQ discussed the distance between the lake and the permit area, how this distance would affect visibility and noise effects, the geographic and temporal scope of the disturbance, the severity and frequency of noise from blasting, the duration of the permit and the length of time required for reclamation, and other factors. This constitutes an adequately robust investigation, acknowledgment, and discussion of aesthetic impacts to justify DEQ's conclusions. The Belks may perceive the significance of the quarry differently, and they may take issue with the outcome DEQ reached, but DEQ's assessment process was procedurally sound and comported with MEPA's "hard-look" directive.

¶32 *Issue Three: Did the District Court err in denying the Belks' motion to supplement the record?*

¶33 When a district court reviews an administrative agency decision, it must base its review on "the record before the governing body at the time of its decision." *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 66, 360 Mont. 207, 255 P.3d 80. In certain circumstances, a court may need to admit extra-record evidence, materials beyond those considered by the agency, if it would make clear what the agency *should have* considered. We have previously noted that without this evidence, it may be "impossible for the court to determine whether the agency took into consideration all relevant factors." *Skyline Sportsmen's Assn. v. Bd. of Land Commrs.*, 286 Mont. 108, 113, 951 P.2d 29, 32 (1997) (citing *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980).

15

¶34 The administrative record that DEQ submitted to the District Court in this case included files relating to Glacier Stone's Metal Mine Reclamation Act (MMRA) permit application and all the environmental documentation for the MEPA process. DEQ did not include documents relating to the Small Miner Exclusion Statement (SMES) or its letters to Glacier Stone about violating the SMES rules, which predated and prompted the permit application. In the MEPA documents, DEQ did narratively describe the context of the violation leading to the permit application.

¶35 The Belks moved for the District Court to supplement the record with the SMES files and DEQ's violation letters, and the District Court denied their motion. They appeal that decision here, arguing that the absence of these files detailing Glacier Stone's past noncompliance taints the District Court's review of DEQ's decision-making.

¶36 The crux of this issue is the relevance of the SMES files to DEQ's decision-making under the MMRA and MEPA. As noted, the supplemental materials the Belks moved to admit need either to have been considered by the agency in reaching its decisions or to demonstrate what the agency should have considered but did not. The Belks argue that the SMES materials are relevant because they speak to the likelihood Glacier Stone's activity will comport with its proposal—the likelihood it will fail to comply again. The Belks point to the MMRA's provisions on reclamation plans, which include considering "site-specific conditions and circumstances." Section 82-4-336(1), MCA. And they point to DEQ's rules for preparing EAs, which include assessing whether there is a "reasonable assurance" predicted impacts will or will not occur and the "degree of uncertainty" present.

16

Admin. R. M. 17.4.608(1)(b), 17.4.609(2)(c) (2021). Given these factors, the Belks argue, the SMES history must be relevant to DEQ's MMRA and MEPA decisions.

¶37 However, DEQ points out that its posture under either law is forward-looking and that therefore the detail from the SMES history cannot be relevant. The MMRA spells out explicitly when the agency may deny a permit application, and noncompliance with an SMES is not an applicable reason. *See* § 82-4-351, MCA. Past noncompliance may only affect an applicant's consideration in several specific circumstances that are not applicable here, like the forfeiture of a reclamation bond. *See* § 82-4-360, MCA. Thus, not only were the additional files not relevant to DEQ's MMRA decision, but the agency was also not even permitted to consider them in reaching its decision and instead had to evaluate the application on its proposed terms.

¶38 Under MEPA, the situation is similar. DEQ's task is to prepare an assessment of the environmental and other impacts of a proposed action, not a past action. Thus, all its information collection and analysis are directed at the consequences of the future permitted activity. This directive does not include speculation about what would happen if the permit was violated or the likelihood of violation. As DEQ points out, the administrative rules cited by the Belks arise in the specific context of discerning the cause-and-effect relationship between a proposed action and an environmental impact. Admin. R. M. 17.4.608(1)(b) (2021) ("the probability that the impact will occur *if the proposed action occurs*; or conversely, reasonable assurance in keeping with the potential severity of an impact that the impact will not occur"); Admin. R. M. 17.4.609(2)(c) (2021) ("the degree of uncertainty that *the proposed action* will have a significant impact") (emphasis added).

17

Additionally, other parts of DEQ's MEPA rules direct it to consider enforceable mitigation measures and the potential impacts that would result without them. Admin. R. M. 17.4.609(2)(d), (3)(g) (2021). This process sufficiently covers analysis of the harms that might follow noncompliance, and the SMES paperwork detailing the procedural history would not be relevant to these considerations.

¶39 Furthermore, the SMES noncompliance that the Belks lament was absent from the District Court's analysis was in fact well-known and established the predicate posture of DEQ's entire process. The administrative record that DEQ submitted made clear that SMES noncompliance led to the permit application in the first place, and it was obvious that this underlying context was not being surreptitiously ignored. The District Court did not err in denying the Belks' motion to supplement the record.

## CONCLUSION

¶40 We affirm both the District Court's May 1, 2020 order denying the Belks' motion to supplement the record and its December 4, 2020 order granting summary judgment to DEQ.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE